# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| KATHY McCOWAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.: 1:08-cv-55 |
| | ) |
| OMBUDSMAN EDUCATIONAL | ) |
| SERVICES, and EDUCATIONAL | ) |
| SERVICES OF AMERICA, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Plaintiff Kathy McCowan alleges that she was discriminated against and harassed based on her race which caused her to quit her job at Ombudsman Educational Services. She has sued both Ombudsman, and its parent company Educational Services of America claiming employment discrimination, and they now seek summary judgment. (DE 72.) Because McCowan quit her job and was not constructively discharged, she cannot show that she was subjected to an adverse employment action. For this and other reasons discussed below, summary judgment will be granted.

## Background

Ombudsman is a company that works with public school districts to provide alternative education to middle and high school students. Ombudsman operates through a very specific educational program. (DE 74, at 2-3.) The program is highly individualized, and with the specialized instructions, the students at Ombudsman receive an alternative approach to academics. (DE 74, at 3; Petersen Aff. ¶ 11.) Educational Services of America ("ESA") is Ombudsman's parent company but does not maintain personnel files for Ombudsman

employees. (DE 74, at 6.) ESA does however provides some legal and administrative services to Ombudsman. (*Id.*)

Ombudsman operates over 80 programs throughout the country. McCowan was employed by an Indiana facility, which is managed by an office in Illinois. Ombudsman's decisions about hiring, firing, and disciplining Ombudsman employees are made by its personnel in Illinois. (Russell Aff. ¶ 7.) Ombudsman's East Allen School Director Deborah Petersen hired and supervised the teachers at the East Allen location. She had a reputation as a tough supervisor; some employees complained about her demands, and one quit because of the workload. (Russell Aff. ¶ 11.)

Kathy McCowan was employed by Ombudsman from August 14, 2006 to March 22, 2007 at Ombudsman's East Allen location. After an in-person interview with Petersen, she hired McCowan over nine other candidates because she was impressed with her qualifications and demeanor. (Petersen Aff. ¶ 6.) McCowan was hired in a part-time position as a Certified Teacher. Prior to beginning her employment, she signed an acknowledgment that she received an Ombudsman Employee Handbook, and completed an Ombudsman New Employee Checklist. (McCowan Dep. at 52-53, 55-56.) Petersen was McCowan's direct supervisor.

A month prior to hiring McCowan, in July 2006, Ombudsman hired Dawn Mathias as a full-time Certified Teacher. Mathias's responsibilities included general housekeeping before the students arrived, dealing with technology issues, and assisting Petersen in drafting and submitting weekly reports. (Mathias Aff. ¶¶ 2-4; Petersen Aff. ¶ 8.) Mathias also reported to Petersen. (*Id.*) During her employment, Petersen reviewed Mathias's work, finding she made a lot of mistakes, but that over time she improved. To correct her mistakes, Petersen would speak

to Mathias about it or write her a note on a post-it or notepaper. (Petersen Aff. ¶ 21; Mathias Aff. ¶ 7.) Although Mathias accepted Petersen's criticism without complaint, she did express concern that the workload was too demanding. (Mathias Aff. ¶ 10.)

Like Mathias, McCowan received performance feedback from Petersen, beginning with a 30-Day Orientation and Training Review. The 30-day review stated that McCowan should review the employment manual, study training notes, and use the student log. (Petersen Aff. ¶ 24.) Later, Petersen filled out a 60-day review, noting again that McCowan needed to review the manual, learn scope and sequence, and needed to design and follow a time management plan. (Petersen Aff. ¶ 25.)

From observing McCowan over time, Petersen saw that McCowan didn't write the lesson plans according to the Ombudsman program, her work was untimely, and she didn't maintain student logs. (*Id.* ¶¶ 55-56.) Petersen corrected McCowan by writing her notes or by discussing the problems with her in person. (*Id.* ¶¶ 67, 61.) By November 2006, Petersen was so dissatisfied with McCowan's work that she contacted Scott Russell, her supervisor located in Illinois, to ask him to emphasize her areas of concern at an upcoming meeting. (Petersen Aff. ¶ 33, Ex. B.) At that meeting, McCowan turned the tables; she complained to Russell about Petersen's training methods and her concern that she was being over-scrutinized by Petersen. (Russell Aff. ¶ 19; McCowan Dep. at 111, 118.) After the meeting, Russell directed Petersen to retrain McCowan and Mathias, and instructed Petersen to correct McCowan with written notes rather than oral explanations. (Russell Aff. ¶ 23; McCowan Dep. at 165.)

McCowan was satisfied with the follow-up training Petersen conducted, but the mistakes persisted. (McCowan Dep. at 166-67; Petersen Aff. ¶ 38.) When Petersen used the post-it note

3

approach to correct her, McCowan complained about that approach as well, causing Petersen to create lists of mistakes made by McCowan and then she would discuss them with McCowan in person. (McCowan Dep. at 234-35; Petersen Aff. ¶ 40.)

Because McCowan's errors were continuing, at the end of February, Russell, Petersen, and the Human Resource Director Heather Achtemeirer decided to give McCowan an oral warning and personal development plan. (Petersen Aff. ¶ 44; Russell Aff. ¶ 31; McCowan Dep. at 307-08.) McCowan received and signed the plan. (Petersen Aff. Ex. C.) McCowan wasn't suspended, demoted, denied benefits, or terminated. (McCowan Dep. at 299.)

Around March 1, 2007, McCowan submitted a written complaint to Russell, again voicing her concerns about Petersen's criticisms. (McCowan Dep. at 104-05.) Russell reviewed it and spoke to his supervisor about it. On March 20, Russell and Achtemeier attempted to speak to McCowan about the complaint, but McCowan did not return their phone call. (Russell Aff. ¶ 38.) They decided after reviewing the complaint that it lacked merit, and Achtemeier documented the steps they took to investigate McCowan's complaint. (Achtemeirer Aff. Ex. A.)

McCowan called in sick on March 20, 2007, did not show up for work on March 21, 2007, and submitted her resignation letter to Ombudsman on March 22, 2007. (McCowan Dep Ex. 14; Petersen Aff. ¶ 47.) She stated that she resigned because of stress, Petersen's treatment, and Russell's failure to properly address her complaint. (McCowan Dep. at 202.)

McCowan filed an EEOC charge naming Ombudsman and claiming she was the victim of racial discrimination. (DE 1, at 3.) After the EEOC completed its investigation, McCowan received a right-to-sue letter. (*Id.* at 4.) Even though McCowan had named Ombudsman in her EEOC charge, she filed this lawsuit only against Deborah Petersen, Scott Russell, and

Educational Services of America, claiming she was a victim of racial discrimination. I later permitted her to amend her complaint to add Ombudsman as a party, which she did. I also dismissed her claims against Petersen and Russell because Title VII does not provide a cause of action against supervisors. (DE 26, at 6.) Defendants' Motion for Summary Judgment and motion to Strike McCowan's exhibits attached to her response to the summary judgment motion, followed.

## Motion to Strike

As an initial matter, I need to resolve Defendants' Motion to Strike. (DE 92.) McCowan's response to Ombudsman's motion for summary judgment includes a Statement of Material Facts in Dispute, which responds to each of Ombudsman's material facts. Her designation of evidence includes 34 exhibits. (DE 81, at 1-2.) Ombudsman filed a motion to strike 24 of those exhibits. (DE 93, at 4-5.) Because the documents in question are not properly authenticated, as required by Rule 56(e), the motion to strike is granted.

A party cannot survive a motion for summary judgment with sham factual issues; the evidence relied upon by the nonmoving party "must be competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). Documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e), and the affiant must be a person through whom the exhibits could be admitted into evidence. *See Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006).

Here is a list of the items Defendants seek to strike:

Exhibit A: Errors of Deborah Peterson and Dawn Mathias
Exhibit B: Scope & Sequence
Exhibit B1: Scope & Sequence
Exhibit C: Academic Audit

> Exhibit D: Log of specific incidences for Deborah Petersen
> Exhibit E: Petersen's Employee Performance Summary
> Exhibit E1: Employee Performance Summary
> Exhibit E2: Employee Performance Summary
> Exhibit F: ESA Employee Problem Resolution Form
> Exhibit F2: Kathy McCowan Earning Statement
> Exhibit H: McCowan Resume
> Exhibit K: New Employee Checklist
> Exhibit M: Orientation and Training Reviews
> Exhibit N: Petersen's Manual Training Notes
> Exhibit O: Student Program Samples
> Exhibit P: Petersen email to Russell
> Exhibit Q: Task sheets
> Exhibit R: Deviation
> Exhibit S: November meeting notes with Russell
> Exhibit S1: McCowan's email to Russell
> Exhibit T1: Personal Development Plan for McCowan
> Exhibit U: McCowan's Medical Excuse
> Exhibit W: Pictures of trash and dirty walls
> Exhibit X: Management Training Notice

Exhibits A and D are logs that McCowan evidently kept while working at Ombudsman. I say "evidently" because I cannot be sure when they were drafted or who authored them. Exhibit A is a list of alleged mistakes made by Mathias and Petersen, and Exhibit D is a log of specific incidents concerning Petersen that McCowan says she observed while working at Ombudsman. (DE 81-2, at 1-7, 12-23.) Like all of McCowan's exhibits, the logs are not accompanied by an affidavit authenticating them, and for that reason alone they can be stricken. As Defendants note, documents or letters submitted under Rule 56(e) must be accompanied by an affidavit that authenticates the document. *Article II Gun Shop, Inc. v. Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006). Although McCowan is proceeding *pro se*, she must nonetheless follow the rules of procedure. *Pearl Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008). Otherwise, *pro se* litigants would be at a distinct advantage. Exhibits A and D are thus stricken.

McCowan did not submit affidavits with the remaining exhibits either. The exhibits

McCowan submitted include typed and hand-written notes, pictures, and correspondence. (Exhibits B, B1, E1, E2, F, H, K, M, M1, M2, N, O, P, Q, S, S1, U, V, W.) But, again, I have no way of verifying the authenticity of the documents, and none of the documents are self-authenticating under Fed. R. Evid. 902. Without an affidavit authenticating the documents, I cannot consider them under Rule 56(e). Exhibits B, B1, C, E, E1, E2, F, F2, H, K, M, N, O, P, Q, R, S, S1, T1, U, W, and X are also stricken.

Defendants' also note that Exhibits L and L1 are sections of McCowan's Complaint and Amended Complaint. (DE 81-2, at 36-39.) McCowan attached these to establish a genuine issue of fact, but I cannot consider these exhibits for that purpose because Rule 56(e)(2) requires something more specific than a simple reference to the pleadings; there has to be admissible evidence presented to avoid summary judgment. *Drake v. Minn. Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

For the reasons stated above, McCowan's Exhibits A, B, B1, C, D, E, E1, E2, F, F2, H, K, M, N, O, P, Q, R, S, S1, T1, U, W, and X submitted in Opposition to Defendants' Motion for Summary Judgment are stricken. In any event, for reasons discussed below, even if I were to consider the documents attached to McCowan's brief, summary judgment would still be appropriate.

**Motion for Summary Judgment**

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment carries the initial burden of

demonstrating an absence of evidence to support the position of the non-moving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The non-moving party must then set forth specific facts showing there is a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine dispute about a material fact exists only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

McCowan claims she was discriminated against based on her race (she is African-American), retaliated against, and subjected to a racially hostile work environment. The Defendants argue that both ESA and Ombudsman are entitled to summary judgment. As to ESA, there is a predicate question whether, as the parent company to Ombudsman, it is McCowan's employer. I'll address that issue first before turning to McCowan's substantive claims.

**I.      Summary Judgment as to Educational Services of America**

To be liable under Title VII, an entity must be an employer. 42 U.S.C. § 2000e-2(a); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007). There are three exceptions to Title VII's employer requirement where an employee may sue the parent company of its employer: (1) where its appropriate to pierce the corporate veil; (2) where the employer purposefully separates itself to avoid liability; or (3) where the parent corporation participated in the discriminatory acts. *Papa v. Katy Indus., Inc.*, 166 F.3d 837, 940, 942 (7th Cir. 1999).

The record before me convinces me that ESA wasn't McCowan's employer, and that the exceptions don't apply here. Petersen hired McCowan to work at Ombudsman's Indiana facility.

The documentation regarding her employment consistently used Ombudsman letterhead. (DE 76-3, at 3-6.) McCowan was supervised by Petersen, who was supervised by Russell, and they both were Ombudsman employees. An ESA representative alleges that all of McCowan's communications regarding her employment were with Ombudsman employees, and McCowan doesn't dispute that. (Hanback Aff. ¶ 11.) And it's telling that McCowan directed her resignation to Ombudsman – not ESA. (DE 76-3, at 7.)

McCowan doesn't allege any facts to show that exceptions to the general rule apply here. She does not allege facts to show that piercing the corporate veil would be appropriate, or that ESA participated in the allegedly discriminatory acts. Rather, she simply states that ESA didn't deny being McCowan's employer, and she points to a signed acknowledgment of an ESA handbook and an ESA paystub. (DE 81-2, at 29-30.) But these are insufficient to pierce the corporate veil or show that ESA participated in the alleged discrimination. The paystub lists Ombudsman as the employer, not ESA. And although McCowan signed the ESA handbook acknowledgment, the acknowledgment is the typical type of administrative support a parent may provide for its subsidiaries. *See Papa*, 166 F.3d at 943.

In sum, the facts before me indicate that ESA was not McCowan's employer, and ESA is thus entitled to summary judgment.

**II.     Summary Judgment as to Ombudsman**

McCowan claims that she was discriminated against and retaliated against by Ombudsman. She also claims that she was subjected to a racially hostile work environment. I take up each of these claims below.

**A. Discrimination Claim**

Title VII, makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1). To establish a claim of race discrimination, a plaintiff has two options. First, she may proceed under the direct method using either direct or circumstantial evidence. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004). Alternatively, a plaintiff can proceed under the indirect burden shifting method. *Whittaker v. Northern Illinois University*, 424 F.3d 640, 645-646 (7th Cir. 2005).

Ombudsman has advanced several reasons why it is entitled to summary judgment on the disparate treatment claim, but I will limit my discussion to one. Whether she proceeds under the direct or indirect method of proof, the plaintiff must establish that she was subjected to an adverse employment action – meaning she must show that she was discriminated against with respect to her "compensation, terms, conditions, or privileges of employment." *Id.*; *see also Lucero v. Nettle Creek Sch. Corp.*, 566 F.3d 720, 730 (7th Cir. 2009); *Brummett v. Sinclair Broad Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005). McCowan failed to show that she suffered a material adverse employment action stemming from racial discrimination.

A material adverse employment action is something "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993). Rather, it is "a significant change in the claimant's employment status such as hiring, discharge, denial of promotion, reassignment to a position with significantly different job responsibilities, or an action that causes a substantial change in benefits." *Rhodes v. Ill. DOT*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Bell v. E.P.A.*, 232 F.3d

10

546, 555 (7th Cir. 2000)). It is well established that negative employment evaluations, reprimands or a bruised ego unaccompanied by some tangible job consequence do not constitute an adverse employment action. *Haywood v. Lucent Tech., Inc.*, 323 F.3d 524, 532 (7th Cir. 2003); *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001).

No one disputes that McCowan quit her job, and that when someone voluntarily resigns a position, that is not an adverse employment action as that term is used in Title VII. *See Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 886-87 (7th Cir. 1998). Instead, McCowan alleges that she was constructively discharged due to the racial discrimination she suffered. (DE 87, at 10; DE 33, at 8.) And if she can prove this, then this would amount to an adverse employment action. But the bar is a exceedingly high. To show that she was constructively discharged, McCowan must show that the working conditions were so intolerable that a reasonable person would resign, and that the conditions were intolerable because of unlawful discrimination. *Simpson v. Bor-Warner Automotive, Inc.*, 196 F.3d 873, 877 (7th Cir. 1999).

In viewing the evidence in a light most favorable to McCowan, the conditions McCowan dealt with at Ombudsman were not intolerable. McCowan's complaint about the work conditions are general; she states that "Petersen constantly harassed, intimidated, bullied, defamed, racially discriminated against, disparately treated, and retaliated subjectively against McCowan." (DE 87, at 11.) Then she argues that she suffered "physical, mental, and emotional harm" as a result, culminating in her March constructive discharge. For support she points to a doctor's note stating that she should be excused from work. (DE 81-2, at 86.) However, this note was stricken, and even if it weren't, a note stating that McCowan was in the clinic isn't enough to show that she couldn't physically go to work because of the conditions there. *Cf.*

11

*Pollard v. E.I. du Pont de Nemours & Co.*, 121 U.S. 843, 921-22 (2001) (finding a plaintiff suffered constructive discharge after suffering verbal abuse, and undergoing psychological and psychiatric evaluations, where a doctor concluded that she couldn't return to work).

Further, Ombudsman's unrebutted factual assertions indicate that there was no constructive discharge. McCowan complained to Russell about the way that Petersen pointed out her mistakes. (Russell Aff. ¶ 19; McCowan Dep. at 111, 118.) Afterwards, Petersen changed the way that she corrected McCowan. (Russell Aff. ¶ 23; McCowan Dep. at 165.) It's true that McCowan submitted a formal complaint on March 1 that was not addressed until March 20. But that's not an unreasonable amount of time for Ombudsman to respond to her complaint; employers are afforded a reasonable amount of time to respond to a complaint before a constructive discharge occurs. *See Grube v. Lau Indus., Inc.*, 257 F.3d 723, 728 (7th Cir. 2001). This type of environment, where she was repeatedly corrected in a way that may have been rude, cannot conceivably be described as intolerable. The bottom line is that Ms. McCowan quit; she was not constructively discharged. *See Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002).

What's more, even if the conditions could be described as intolerable, there are no facts to suggest that the intolerable conditions resulted from racial discrimination. *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044 (7th Cir. 1999). First, Petersen interviewed McCowan in person knowing that she was African-American, liked her demeanor, was impressed with her qualifications, and hired her. (Petersen Aff. ¶¶ 5-7.) It was only after McCowan began working and having performance problems that Petersen treated McCowan in the manner McCowan complains of. (Petersen Aff. ¶ 26.) To be sure, Petersen was a demanding boss, but the

environment was not a racially charged one. As Ombudsman points out, and McCowan fails to refute, other employees supervised by Petersen who are not African American, said that Petersen was often frustrated when employees made mistakes. Mathias, a Caucasian employee, believed that Petersen would become frustrated with her whenever she made mistakes. (Mathias Aff. ¶ 9.) And another Caucasian working for Petersen actually quit working at Ombudsman because he believed the workload was too heavy. (Russell Aff. ¶ 11.) McCowan also admitted that Petersen never used racial slurs, and she doesn't point to a single instance where Ombudsman took any blatant or overt action against her because of race. (McCowan Dep. at 78.). In sum, McCowan cannot show that she was constructively discharged.

Nor can McCowan show that her working conditions were altered in some other material way. *De la Rama v. Illinois Dep't of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008). This would be an alternate way of establishing that she was subject to an adverse employment action. *Id.* To show that her working conditions were materially altered, McCowan must show more than the fact that she was unhappy or that she had her ego bruised by Petersen. *See Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996); *Flaherty v. Gas Research Inst.*, 31 F.3d 451, 456 (7th Cir. 1994).

Like her constructive discharge argument, McCowan vaguely claims that her working conditions were altered. She explains how they were altered by comparing herself to Mathias. In particular, McCowan complains that Peterson's criticisms were overly harsh to McCowan but not Mathias, a Caucasian employee. She states that Petersen treated her like a student, but did not treat Mathias like a student. (DE 87, at 15-16.) But McCowan doesn't support this contention with facts. And she doesn't acknowledge that Petersen criticized the two in similar

13

ways, using the post-it note system or oral corrections. (Mathias Aff. ¶ 7; Petersen Aff. ¶¶ 61, 67.) Although McCowan claims that Petersen didn't criticize Mathias as often, Petersen didn't always correct Mathias in front of McCowan. (Mathias Aff. ¶ 7.) Mathias, like McCowan, complained that Petersen's demands were too high. (Mathias Aff. 11.) But in contrast to McCowan, Mathias improved her performance, and stuck it out.

In sum, McCowan wasn't constructively discharged, and at no time during her tenure at Ombudsman were her working conditions materially altered. So she wasn't subjected to an adverse employment action. For this reason, and perhaps others, Ombudsman's Motion for Summary Judgment on her disparate treatment claim is granted.

### B. Retaliation Claim

Title VII prohibits an employer from discriminating against an employee because "[she] has opposed any practice made an unlawful employment practice by [Title VII] or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *See* 42 U.S.C. § 2000e-3(a). A plaintiff can prove retaliation using either the direct or indirect method of proof. *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007). But under both methods the plaintiff must prove that she engaged in statutorily protected activity and that she suffered an adverse employment action as a result. *Id.*; *see also Gates v. Caterpillar, Inc.*, 513 F.3d 680, 686 (7th Cir. 2008).

McCowan did not engage in statutorily protected activity. McCowan thought that Petersen was rude, overbearing, too demanding, and she didn't like the way she ran the office. Although McCown certainly complained a lot about her boss, those complaints were not

14

concerning "an unlawful employment practice" as is required by the statute. In other words, it isn't enough to simply complain about harassment; the complaints must be about something that Title VII forbids. *Kodl v. Board of Education School Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007). For this reason, her retaliation claim must fail.

In addition, as discussed in the preceding section, McCowan did not suffer an adverse employment action. It is true that the standard for proving an actionable adverse employment action is broader for a retaliation claim than it is for a discrimination claim. *Whittaker*, 424 F.3d at 647. In contrast to a discrimination claim – where an employee must show an adverse action with respect to the terms, compensation, conditions or privileges of employment – in a retaliation claim all that an employee must show is that a reasonable employee would have been dissuaded from making a complaint of discrimination. *Washington v. Illinois Dep't of Rev.*, 420 F.3d 658, 662 (7th Cir. 2005).

But even under the lower standard of proof for retaliation, McCowan has failed to establish that she suffered from an adverse employment action. If one were to assume that McCowan engaged in protected activity by complaining about Petersen, no reasonable employee would feel dissuaded by Ombudsman's actions. Russell actually attempted to improve McCowan's employment situation after McCowan complained about Petersen's tough approach to critiquing her. McCowan was simply dissatisfied with how Petersen subsequently criticized her. And despite the fact that they felt her formal complaint lacked merit, Russell and Achtemeier tried to investigate McCowan's formal complaint with her, but she wasn't responsive. So there's been no adverse employment action sufficient to sustain McCowan's retaliation claim.

15

## C. Hostile Work Environment Claim

To state a claim for a hostile work environment, a plaintiff must demonstrate that (1) she was subject to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability. *Luckie v. Ameritech Corp.*, 389 F.3d 708, 713 (7th Cir. 2003).

Once again, Ombudsman has shown that McCowan hasn't demonstrated the requisite elements. First off, she was not subjected to unwelcome harassment *based on race*. As I have discussed above, none of McCowan's complaints about the work environment at Ombudsman had anything to do with race. At most, Petersen's treatment of her was rude and bullying. Indeed, I have accepted as fact that Petersen was a demanding and difficult boss. But even if one were to assume that the working conditions were hostile and the hostility was severe or pervasive, it doesn't mean that this was a *racially* hostile working environment. This is fatal to her claim.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment (DE 72) and Motion to Strike (DE 92) are both **GRANTED**.

**SO ORDERED.**

**ENTERED**: July 7, 2010

                                        s/ Philip P. Simon
                                        PHILIP P. SIMON, CHIEF JUDGE
                                        UNITED STATES DISTRICT COURT

COPIES TO:

Debra Brooks:  debra.brooks@ogletreedeakins.com
Todd Kaiser:  todd.kaiser@ogletreedeakins.com

Kathy McCowan
P.O. Box 6118
Fort Wayne, IN  46896-6118